MAGEE (McNEIL v.). See Case No. 8.915.

## Case No. 8,944.

### MAGEE et al. v. The MOSS.

[Gilp. 219.] [1]

District Court. E. D. Pennsylvania. Nov. 12, 1831; Dec. 31, 1831.

SEAMEN'S WAGES — FORFEITURE — DESERTION — SHIPPING ARTICLES — CERTAINTY OF VOYAGE — ENTRY IN LOG BOOK — MASTER'S CRUELTY — IMPRISONMENT IN FOREIGN PORT.

1. The shipping articles must declare explicitly the ports at which the voyage is to commence and terminate.

[Cited in The Brutus, Case No. 2.060.]

2. Where shipping articles declare the voyage to be "from Philadelphia to South America, or any other port or ports, backwards and forwards, when and where required, and back to Philadelphia," it is no violation of the contract with the seamen, for the master to proceed from South America to Europe, and affords no justification to them for leaving the vessel.

[Disapproved in Snow v. Wope, Case No. 13,-149.]

3. To subject a seaman to the forfeiture of his wages for desertion, according to the provisions of the act of 20th July, 1790. [1 Stat. 131], the prescribed entry in the log book is indispensable.

[Cited in Spencer v. Eustis, 21 Me. 521.]

1 [Reported by John R. Gilpin, Esq.]

4. Where the departure of the seamen from a vessel, before the termination of the voyage, is involuntary on their part, or with reasonable cause, or with the apparent assent of the master, they do not forfeit their wages.

[Followed in Jansen v. The Theodor Heinrich. Case No. 7.215. Quoted in The Lilian M. Vigus. Id. 8.346.]

[See The Balize, Case No. 809.]

5. To justify seamen for leaving a vessel, before the termination of the voyage, on account of the cruelty of the master. it must be apparent that they could not remain without extreme danger to their personal safety.

6. Where a seaman is imprisoned by the authorities of a foreign country for a violation of its laws. the costs and charges may be deducted from his wages: but not so when he is imprisoned at the instance of the master of the vessel.

[Cited in The David Pratt, Case No. 3,597.]

7. The imprisonment of a seaman in a foreign gaol, at the instance of the master of a vessel, is only to be justified by extreme necessity.

[Cited in Jordan v. Williams, Case No. 7.528.]

[Quoted in Buddington v. Smith, 13 Conn. 336.]

The libellants [John Magee, Alexander Ware, John Dunderfield, and William Pitt] were seamen on board the ship Moss. They shipped at Philadelphia, as appeared by the articles, on the 2d January, 1830, on board the ship Moss, at the wages of fifteen dollars a month, "on a voyage from Philadelphia to South America, or any other port or ports, backwards and forwards, when and where required, and back to Philadelphia, unless sooner discharged." The vessel sailed on the 3d January, for Buenos Ayres, where they arrived about the 5th March. All the persons on board were put on an allowance of three quarts of water each per day, from the 22d February until they made the land. They sailed from Buenos Ayres, on the 27th June, for Havanna, where they arrived on the 3d September. All the persons on board were put on an allowance of one pound of bread each per day, from the 8th July until they reached the Havanna, but there was plenty of potatoes, vegetables and meat given them. The vessel remained at Havanna until the 30th December, 1830, when she proceeded to Marseilles, thence to Pernambuco, and thence back to Philadelphia, where she arrived on the 10th October, 1831. On the 19th December, 1830, the libellants left the vessel at the Havanna, having first made known their intention so to do to the American consul, without having received the wages then due to them, and without any assistance from the captain to enable them to return to the United States. The libellants declare that during the time they remained on board the vessel, they were not allowed a sufficient quantity of provisions, and were treated with extreme cruelty; during the time they were at the Havanna, Ware and Dunderfield, two of the libellants, were confined in gaol, at the instance of the captain; and they finally left the vessel, because they discovered that the captain was about to

carry them from the Havanna to an European port, contrary to the contract as contained in the shipping articles, and also because of the ill treatment they had experienced.

The respondent, Edmund Fennell, who was the master of the vessel, denies in his answer that the libellants were obliged to leave her in consequence of ill treatment or abuse, or because the provisions were insufficient or bad. He alleges that when the two seamen, Ware and Dunderfield, were confined in prison at his instance, it was done with the assent of the American consul, on account of their drunkenness and improper conduct, and on one occasion, when he found that Ware had been put in gaol by the Havanna police, he obtained his discharge and paid the costs, together with the expense of medical attendance which he afterwards required. He further alleges that Magee, Ware and Dunderfield deserted from the vessel; that their desertion was regularly entered in the log book; and that other seamen were hired in their places at higher wages. The account annexed to the libel claims full wages from the time of shipment until the libellants left the vessel; additional wages for the time they were on short allowance; and their expenses from the day they left the vessel till they reached Philadelphia. The respondent, besides alleging an entire forfeiture on the ground of desertion, claims allowance for various sums advanced, for the excess of additional wages paid to seamen shipped in their places after they left the vessel, and for the expenses of their several imprisonments at the Havanna. The libellants were severally examined for each other, to support the allegations of the libel. On the other side, for the respondent, the supercargo of the vessel from Havanna, and the first mate of the ship, who also joined her at Havanna, and other witnesses were produced; their testimony contradicted, or greatly weakened the evidence of the libellants, especially on the subject of the provisions. There was rice on board, which was occasionally served out, also potatoes, and generally the stores of the ship were good, indeed of a superior quality. The accounts also of the severity of the captain were softened and modified.

C. Ingersoll, for libellants.

There has been such a deviation from the voyage contracted for as discharges the seamen from the contract. The words "other port or ports, backwards and forwards," intend only ports in South America. The voyage was "to South America, or, (not 'and,') any other ports." Having gone to Buenos Ayres was a full performance of the articles. "Backwards and forwards," means between South America and Philadelphia. "Any other port or ports," is as general as "elsewhere;" they mean the same thing. By the first section of the act of congress of 20th

July, 1790, the articles must declare the voyage and terms of shipment. This was to prevent uncertain and indefinite contracts, or terms of service; to guard and protect seamen against their own heedlessness in signing articles. Can seamen, under the general description of port or ports, be kept indefinitely, and carried to any part of the world? There is no limitation here even of time. Nor is a voyage to Marseilles either subordinate to, or consistent with, the voyage described in the articles. 1 Story, Laws, 102 [1 Stat. 131]; Anonymous [Case No. 449]; Brown v. Jones [Id. 2,017]; The Brutus [Id. 2,060]; Wood v. The Nimrod [Id. 17,959].

Was there a consent or acquiescence on the part of Captain Fennell that these men might leave the vessel? When a forfeiture of wages is insisted on, a clear case must be made out against the seamen. The seventh section of the act of congress of 20th July, 1790, invests the master with certain powers. He is bound to use these and all the means afforded by the law to recover and retain the seamen, before he can resort to forfeiture. The answer of the captain to the mate, when asked if he was about to discharge the seamen, shows either that he was conscious they had a right to go on account of the change of the voyage, or that he was willing to part with them. They did not consider themselves as deserters; neither did the captain so consider them. Will the court then so consider them? They applied to a lawyer for counsel; they appealed to the court of the place where they were, being willing to meet the captain, to have their right discussed and decided; they were sent by the court to the master of the port, and by him to the consul, who gave them a letter to take on board the ship. The captain adopted no measures to bring them back to the ship; he never even asked them to return, although he frequently saw them. They went about at large, making no attempt at flight or concealment. All this was acquiescence in their departure; they might well so consider it. If this was not acquiescence, still there can be no forfeiture unless the captain had done all in his power to compel their return; that is a part of his duty. These men remained constantly within the sight and recall of the captain, without an effort, or even request on his part for their return. Seamen may leave the ship if a voyage is changed. Abb. Shipp. 147, 464; Ordinances of France, bk. 2, tit. 3, art. 4; Thorne v. White [Case No. 13,989]; Crammer v. The Fair American [Id. 3,347]; Hindman v. Shaw [Id. 6,514]; Moran v. Baudin [Id. 9,785].

J. S. Smith, for respondent.

Had these seamen a right to leave the ship at Havanna; had not the captain a right to insist on their going to Marseilles?

The forfeiture of wages does not rest on the act of congress only, but on the prin-

ciples of the commercial and general maritime law. The act of congress provides penalties for two acts of a seaman. 1. Not rendering himself on board. 2. Absence without leave for more or less than forty-eight hours. If a seaman dies immediately after the vessel sails, his representatives may recover for the whole voyage, on the ground of its entirety. In the case of Sims v. Jackson [Case No. 12,890], it is said. "he would have forfeited the whole, if he had left the vessel." This was not under the provision of the act of congress, but by the maritime law.

The act of congress applies to all the libellants except Pitt; as to the rest its directions were strictly complied with. The excuses set up for leaving the ship are now all abandoned, except two. 1. That the ship was going to Europe, which was not authorised by the articles. 2. That the captain acquiesced in their departure.

I. As to the construction of the articles; are they such as the act of congress requires? The contract must declare the voyage, not describe it. It must be declared, that the seamen may know where they have a right to be discharged, and when. The terminus a quo and ad quem must be stated, but not the intermediate ports. This voyage was from Philadelphia to South America, and back to Philadelphia, omitting the intermediate ports. The words or "any other port or ports" must mean ports not in South America, which was already mentioned. Between South America and the other ports they are to go backwards and forwards, where and when required. The voyage ends on their return "back to Philadelphia," the port of final discharge. The voyage performed was in exact conformity with the articles. The ship went from Philadelphia to Buenos Ayres, in South America, thence to Havanna, a port not in South America, and thence to Marseilles, another port not in South America, thence back to South America, and thence to Philadelphia. 3 Kent, Comm. 178; Abb. Shipp. 463, 468.

II. As to the acquiescence of the captain, it rests only on the fact that he saw them on shore and did not order them on board; this too rests only on the evidence of the men themselves. It does not, besides, apply at all to Pitt. The consul certainly ordered them on board; they refused to go. Suppose the captain did acquiesce; that he used no force to bring them back; was he under any obligation to do so? The deserting seaman must come himself and offer to make amends, and to go on board. The captain is not then bound to receive him if he has hired another in his place. It does not appear whether the captain saw these men on shore before or after he had hired others. Ware was put into prison by the police. Abb. Shipp. 136; 3 Hopk. Works. 206; Whitton v. The Commerce [Case No. 17,604].

C. Ingersoll, in reply.

You cannot strike out "or," and put in "and," which is necessary for the respondent's construction of the article. The men were bound to go to South America, "or" any other ports, not "and" any other ports. All after South America is illegal and void for uncertainty. As to the necessity of an entry in the log book, the act of congress fixes the time of absence which shall be deemed to be a desertion and incur a forfeiture. The maritime law has no such limitation. The act also directs the particular mode of proof of such absence; it must be by the entry in the log book.

HOPKINSON. District Judge. The libellants have presented three claims for the decision of the court. 1. For having been put on short allowance. 2. For wages up to the time they left the ship. 3. For additional pay to bring them back to the United States. The respondent rebuts these claims; the first by the denial of the charge; the second and third by charging the libellants with a desertion from the ship and their duty, by which they have forfeited their wages, and of course every claim to an extra allowance. The fact being admitted that they did leave the vessel at Havanna, it is incumbent on them to show a good cause for doing so, or some legal justification to avoid the penalty which otherwise the law will impose upon them. As to Pitt, besides the justification he relies on, in common with the other libellants, he has a further defence against the penalty of forfeiture, in the omission to note his absence in the log book. This has been repeatedly decided to be necessary; and it must be considered to be settled. when a forfeiture of wages is insisted upon, under the provisions of our act of congress. The same law which gives the forfeiture for the absence of seamen, prescribes an evidence by which that absence shall be proved; and the owner who claims the penalty, must conform himself to the proof required of him, by the same authority which gives the penalty.

The general defence which the libellants have to avoid this penalty, is in the allegation, that the ship was going from Havanna to Marseilles, in Europe; that this was a voyage not within the contract; and that they were not bound to go with her. That the breach of the contract was on the part of the captain in taking the ship to a place not within the terms of the articles. The validity of this defence depends upon the construction of the articles, and the obligation entered into by the libellants when they executed them. The voyage described in the articles is "from Philadelphia to South America, or any other port or ports. backwards and forwards, when and where required, and back to Philadelphia, unless sooner discharged." This is certainly a very awkward description of a voyage. South America is spoken of as a port to which they are to go,

"or" to any other port or ports, without any designation of them, whether in Europe or America; but they are to go backwards and forwards, where and when required. It will not do to tie down these contracts, made sometimes in a counting house, and sometimes in the cabin of a ship, to the strict rules of composition. We must endeavour to come at the true meaning of the parties, and to give the contract a reasonable construction; to take care to put upon general words a just and reasonable limitation; but not lightly to destroy and avoid the whole contract because the generality or breadth of the expressions may be in a degree uncertain, or might be used to impose an oppressive service. The court will take care that this shall not be done, and will avoid the whole if they cannot so limit it. In the present case I can see nothing unreasonable or oppressive in the construction the captain has put upon these articles. He took the ship to Buenos Ayres; he then went to Havanna, and from thence to Marseilles; he came again to a port in South America, and then terminated the voyage by returning to Philadelphia. This voyage or these voyages were strictly within the terms of the contract, and, in my opinion, no unjust or oppressive use has been made of the awkward manner in which the contract is expressed.

In the case of Wood v. The Nimrod [Case No. 17,959], I adopted this principle, and I consider it to be in full accordance with the opinion of Judge Winchester, adopted by Judge Story, in the case of Brown v. Jones [Id. 2,017]. In the case in which the opinion of Judge Winchester is given, Anonymous [Id. 449], the articles specified a voyage from Baltimore "to Curracoa and elsewhere," and the respondent contended he had a right to go to St. Domingo without going to Curracoa. There he claimed to go in direct violation of a clear specification or designation of a port named in the contract, and he made the claim under the general words "and elsewhere." It is also on the face of that contract, that although the voyage commenced at Baltimore. it had no ascertained or declared termination, either as to time or place. We have the "a quo" but not the "ad quem." In such a case, where, besides all this, the respondent had rested his defence on his own deception and breach of faith, the learned judge says "the term 'voyage' is a technical phrase, and always imports a definite commencement and end." In our case, this description of a voyage is fully answered; the uncertainty, such as it is, is about the intermediate ports to which the vessel might go. But even in such a case as that which the judge had before him, he would not absolutely reject the terms "and elsewhere," or destroy the whole contract for their uncertainty. He would give them a reasonable meaning and construction consistent with the contract. "They must be construed" he says, "as subordinate to the voyage specified, and can only authorise the pursuing such a course as may be necessary to accomplish the principal voyage." The judge explicitly says, that he would not be understood "to give any opinion that it is essential to the validity of seamen's articles, that there should be an insertion of the name of every port, to which a vessel may proceed, in the course of trade; but there must be some equivalent specification, such as to a port or ports, island or islands in the West Indies." In the present case, the person who shipped these men, swears that the articles were read to them, and they perfectly understood them, and that he has frequently shipped men to go to "port or ports" without mentioning what part of the world they were in.

The libellants have set up another justification for leaving the ship, to wit, the cruelty and barbarity of the captain to them. Some strong evidence has been produced by the seamen in support of this part of the defence. On the other hand there is evidence which softens, but does not remove this charge against the captain. The ill treatment of sailors, by the officers under whose command they are placed, has so frequently been a subject of complaint, that courts have taken pains to explain the law so as to secure full protection and justice to the seamen on the one side, and to discourage unreasonable complaints on the other. Masters and mates of vessels are often coarse and rough men, with very little control over their tempers, and fond of using their power to its utmost. Seamen are also as often insolent, obstinate, and negligent of their duty, and require a strict hand of discipline. Both have the property of others entrusted to them, and it is the object of the law to give as much security as possible to all these interests. The seamen must submit to a reasonable discipline, and to such privations and punishments as are necessary to enforce a faithful performance of their duties, but they must, nevertheless, be treated as men, with the feelings of men. always entitled to the rights of humanity and the protection of the law. To justify the men in leaving their ship in a foreign port, or abandoning their duty at the hazard of loss or ruin to their owners, they must make out a very strong case indeed. Before they resort to this extreme remedy, the necessity for it ought to be extreme, or so pressing that a moderate and reasonable man could not resist it. They should bear much and trust for satisfaction and redress from the law, when they return home, and not, for every excess of punishment, become their own judges and avengers at the heavy expense of the innocent owners, who pay them for their service, and have trusted to their fidelity. The cases on which the courts have justified the seamen, on a plea of cruelty by the captain, in leaving the service and terminating their contract, have been where it was apparent that they could not remain with him without danger and

damage to their personal safety, such as to make a dissolution of the contract necessary. No man can be bound to serve another at the peril of his life.

In the case of Rice v. The Polly and Kitty [Case No. 11,754], there was not only a most wanton and excessive cruelty or beating of the men, but the most dangerous threats of personal injury if they continued on board. They were obliged to leave the ship at Lisbon, in the midst of the voyage and return in another vessel. The question was, whether they had forfeited their wages. The judge said: "When mariners enter into articles for a voyage, they do not thereby put themselves out of the protection of the laws, or subject their limbs or lives to the capricious passions of a master or his mate." There is no doubt much power given by the law to the master, but the law also watches the use he makes of it, and corrects any abuse of it. In that case the libellants had been cruelly beaten and abused; it was necessary to have a surgeon to cure one of them of his wounds and bruises. The captain and the mate were combined, and supporting each other in their barbarity to the men. The master once declared that "he would make them glad to jump overboard before they got to America." The whole crew left the vessel, but did not secrete themselves on shore; they demanded their wages and clothes and applied for process against the captain and mate, who promised to pay them their wages, and recorded the process. The judge did not, it is true, rely on the promise in giving his judgment, but said: "The libellants have not voluntarily deserted, but have been forced from a service in which neither the rights of humanity nor personal safety could be depended upon or even expected."

To forfeit wages there must be a voluntary departure, without reasonable cause. Abb. Shipp. 464. In the case of Limland v. Stephens, 3 Esp. 269, which was one of seamen's wages, Lord Kenyon says: "There are reciprocal duties between masters and servants. Desertion is a forfeiture of wages: but if the captain conducts himself in such a way as puts the sailor into that situation that he cannot, without damage to his personal safety, continue in his service, human nature speaks the language—a servant is justified in providing for that safety. After the plaintiff had been with the consul, he communicated to the defendant the wish of the consul to see him. The captain said, he would go when it suited him. Being pressed by the plaintiff to go, he beat him very severely, and threw a log of wood which hurt his foot. The plaintiff left the ship, and defendant was heard to say, that if he returned he would chain him to the mast, and bring him to Sweden." In reply to an observation made by the counsel of the defendant, Lord Kenyon said: "Is a man bound to serve at the peril of his life? Desertion is an answer

to the seaman's claim for wages; but that must be a voluntary act of the seaman's, and not caused by any act of the captain. In this case, the act of the captain has made the dissolution of the contract necessary, and, in my opinion, justifiable on the part of the sailor." This case was decided in 1801. The case of The Polly and Kitty [supra], in which the same principles were adopted, was decided in 1789, by Judge Hopkinson, then judge of the admiralty in this district.

I have quoted these cases so much at large, to show that the cruelty must be extreme and dangerous to justify a sailor in leaving his ship and throwing up his contract. In both the cases cited, there was not only barbarous abuse of the persons of the sailors, but threats of future ill usage of a dangerous violence, which there was good reason to believe would be fully executed. The case of the present libellants has no such features; the captain was a harsh, severe man, but by no means of so brutal a character as those we have alluded to. I do not think his conduct justified the libellants in leaving the ship, or made a dissolution of their contract necessary.

The libellants having failed to justify their leaving the ship, either on account of the alleged change of the voyage described in the articles, or the ill treatment of them by the captain, they have incurred a forfeiture of their wages, unless their remaining ground of defence shall avail them, to wit, the consent or acquiescence of the captain in their departure. The forfeiture of wages earned by a hard and perilous service is a severe penalty, and should be exacted only on a clear legal cause. So it has been considered by the courts, and those who claim this penalty have always been required to show themselves to be clearly entitled to it by the performance, on their part, of all the requisitions of the law. The master of the vessel must throw the fault on the offending seamen; he must deal with them fairly, and honestly, and in good faith. He should neither endeavor to drive them from their duty, nor deceive and entrap these rash and ignorant men into a course of conduct, which he sees may draw upon them the loss of their wages, while they have no such suspicion. If they are really and truly acting under a mistaken opinion of their rights, and not from a dishonest or rebellious disposition, they shall be undeceived, their error should be explained, or at least they should not be drawn or permitted, by an insidious silence or an inattention to their proceedings, to involve themselves in the crime of desertion with its ruinous consequences. A practice of this sort upon sailors, may well be considered as a fraud, and the contriver ought not to gain by it. How were the facts of this case? The libellants left the ship under a belief that they had a right to do so; that the intention to take them to Europe was a breach of the contract, and discharged

them from it. They also thought that the treatment they had received from the captain dissolved their contract. They were mistaken in both points; it was a mistake of the law of their case, and not a mutinous resolution to disregard their contract, and the law which bound them to it. Their conduct shows that they had a sincere confidence in their opinion, and were willing to bring it to a fair test. They make no flight, they seek no concealment, they walk openly about the city, they go to the wharf, they meet the captain without apprehension, they demand their wages of him, they apply to the courts of the country for redress, and in every thing they conduct themselves like men confident in their right. What was the conduct of the captain? He passed them again and again; he took none of the measures the law put in his power to bring them back to the ship and their duty; he did not even order them to go on board. In his conversation with the mate he expressed himself doubtfully as to his intention of taking these men with him, and finally sailed away leaving them to shift for themselves.

In the case of Dixon v. The Cyrus [Case No. 3,930], circumstances by no means as decided as these, were considered as strong evidence of consent on the part of the master to the departure of the seamen. The question of good faith is one hardly capable of direct, explicit testimony. It is an impression, an opinion derived from the whole conduct of the party. The conduct of Captain Fennell in his severe treatment of these men while they were under his authority, and his extraordinary abstinence from every attempt, even the most mild, to bring them back after they had left him, present him to my mind as a man of a violent and severe temper, and wanting in frankness and fair dealing. It seems to me that he was dissatisfied with these men, for they had certainly misbehaved themselves, and was quite willing they should leave the ship; but while he endeavoured to compel them to do so by his severity, and would lull them into security by his entire inattention to their absence, he was indulging himself in the anticipation that he would deprive them each of eleven months' wages. He was not open even to his mate. In a case in which the conduct of the captain was so calculated to deceive and mislead the men, and to induce them to believe he had no desire for them to return to the ship, but acquiesced in their opinion that he had no claim upon them to go with him to Europe; where, too, it is at least doubtful whether he did not design to mislead them for the very purpose of forfeiting their wages on a charge of desertion, I will not deprive them of their reward for services faithfully rendered for the space of eleven months. The owners of this ship have, in these services, received full value for the money demanded of them, and I see no just cause for withholding it.

There is a subordinate question in this case which must also be disposed of. The respondent claims a credit for certain prison fees paid at Havanna for the libellants, or some of them. It appears that, except in the case of Ware, the men were imprisoned by, or at the instance of the captain; but Ware was put in gaol, by the police officers of the city, for some misconduct or offence against the laws of the country. For the money paid by the captain to obtain his liberation from imprisonment he is justly chargeable, and the respondent must be credited with the amount. But no such credit will be allowed against the men imprisoned by the captain for his grievances or complaint. I have declared that I will not countenance the practice of thrusting our seamen into foreign gaols by the captain, through the influence he may have with our consuls or the officers in a foreign port. It is always a most severe punishment, and in some climates dangerous to health and life. The punishments which the law authorises the master to inflict on board of his vessel, by personal correction, by confinement and other privations, are generally sufficient for all the purposes of discipline. It should be only in a case of some pressing necessity, of some danger to the vessel, or her master or crew, that the men should be imprisoned on shore.

Decree: It is ordered and decreed, that the libellants shall recover and have from the respondent, the wages severally due to them, from the time they respectively shipped and entered on board of the said ship Moss, until the time when they respectively left the said ship, and ceased to perform any service or duty on board of her, deducting therefrom all payments made to the said libellants respectively, and all credits to which the respondent is entitled for advances of money or goods; and also deducting from the wages severally due to the libellants, the amount paid by the respondent beyond the amount stipulated to be paid to the libellants, to the hands employed in their places for the remainder of the voyage after the libellants had left the ship. And it is further ordered and decreed, that there be deducted from the wages due to Alexander Ware, the money paid by the respondent to obtain his release from the prison at Havanna, in which he had been confined by the authority of that city for offences against its laws and police; but no deduction shall be made from any of the libellants for or on account of any prison fees, or other costs and charges, induced by or in consequence of their imprisonment by the captain of the ship, or the American consul at his instance. And it is further ordered and decreed, that the several accounts of the libellants be adjusted and paid on these principles, and in case of any disagreement between the parties, be reported and referred to the court for final adjudication.

The several claims of the libellants for short allowance are dismissed, and also their claim of two months' pay to keep them at Havanna and bring them home to Philadelphia.

On the 31st December, 1831, the parties having reported their adjustment of the accounts of the several libellants to the court for a final adjudication, it was ordered and decreed that there be paid by the respondent to the libellants severally, the following sums, to wit, to Alexander Ware one hundred and nineteen dollars and nine cents; to John Dunderfield one hundred and forty-three dollars and thirty-two cents; to John Magee one hundred and forty-nine dollars and two cents; and to William Pitt eighty-four dollars and ninety-seven cents.